**SUN FIRST NATIONAL BANK OF OR-LANDO, and Marcia Andersen Murphy, as Co-Trustees of the Jeanette Andersen Trust**

v.

**The UNITED STATES.**

**No. 558–76.**

United States Court of Claims.

Oct. 17, 1979.

David W. Hedrick and John J. Reid, Orlando, Fla., for plaintiff. F. Cleveland Hedrick, Jr., Washington, D. C., attorney of record. Michael D. Savage, Hedrick & Lane, Washington, D. C., Eugene B. Cawood, and Giles, Hedrick & Robinson, Orlando, Fla., of counsel.

Bruce W. Reynolds, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Maxine C. Champion, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and KASHIWA, Judge.

## ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

On rehearing, the opinion of the court of November 15, 1978, is withdrawn, and the following opinion is substituted:

FRIEDMAN, Chief Judge.

This case, before us on cross-motions for summary judgment, presents a difficult question involving the federal income tax liability of a trust for capital gains it received after the death of the settlor who was the income beneficiary of the trust during her lifetime: whether the gains were "income in respect of a decedent" under section 691 of the Internal Revenue Code of 1954, so that the trust was entitled to a deduction for the estate taxes that were attributable to the gains. We answer that question affirmatively and grant the plaintiffs' motion for summary judgment.

### I.

In March, 1941, Jeanette Andersen established an *inter vivos* trust. The trust income was to be paid to her for life and then to her daughter.[1] Upon the daughter's death, the corpus of the trust was to be distributed to the daughter's children. The principal asset she transferred to the trust was shares of Orlando Daily Newspapers, Inc., the publisher of two daily newspapers in Orlando, Florida, which her husband, Martin Andersen, had given her in 1936. Although the record does not show the value of the stock when Mrs. Andersen transferred it to the trust in 1941, it was valued at $11,000 in the gift tax returns filed in connection with Mr. Andersen's transfer of the stock to his wife in 1936. *Estate of Andersen v. Commissioner*, 32 T.C.M. (CCH) 1164 (1973).

Orlando Newspapers prospered, and in 1965, the trust sold its Orlando stock for

---

1. The trust agreement provided that following the death of Jeanette Andersen, the income was to be paid to her husband, Martin Andersen, for his life and then to her daughter. Martin Andersen renounced his life interest in the trust in 1967.

more than $6,000,000. The sale price consisted of $1,557,441 in cash and 15 promissory notes payable annually from 1966 through 1980. Each of the first 14 notes was for $242,179.50, and the final note was for $1,453,077. The trustee treated the gain on the sale as income to the trust and reported it on the installment basis, pursuant to section 453 of the Code.

Because of the large increase in the value of the stock between the creation of the trust in 1941 and the sale in 1965, substantial capital gain was realized upon sale of the stock. The trustee treated this gain as income rather than as an addition to the corpus. He paid most of this income to Jeanette Andersen, as income beneficiary. In 1967, a Florida court, in reviewing an accounting Martin Andersen made upon his resignation as trustee, ruled that under Florida law this treatment of the gain was correct.[2] For federal tax purposes the trust reported the entire capital gain from the notes as income for the years 1966 through 1972, and the grantor reported amounts received as income from the trust.

Jeanette Andersen died in December 1968. In her federal estate tax return, her executrix did not include the value of the corpus of the trust. On audit, however, the Commissioner of Internal Revenue included the corpus on the ground that Jeanette Andersen's retention of a life interest in the property she had transferred to the trust made that property part of her estate under section 2036 of the Code. The Tax Court upheld that determination. *Estate of Andersen, supra.*[3]

The trust then filed claims for refund for the years 1969 through 1972. Its theory was that Jeanette Andersen was the constructive owner of the trust property during her lifetime; and that the gain on the sale of the notes that were paid after her death was income in respect of a decedent, so that the recipient of such income (the trust) was entitled under section 691 of the Code to a deduction covering the estate tax paid on that income. The Internal Revenue Service rejected the claim for refund on the ground that the gain on the notes was not income in respect of a decedent. This suit followed.

## II.

A. Section 691(a) of the Code generally provides that "income in respect of a decedent" that is not part of the decedent's taxable income in the year of his death is taxable to the recipient of such income in the year of receipt if certain specified conditions are met.[4] Section 691(c) of the Code provides that the recipient of income in respect of a decedent is entitled to a deduc-

---

2. Under Florida law, gain on the sale of corpus was to be allocated to corpus, unless the trust instrument indicated a contrary intent on the part of the settlor. Fla.Stat.Ann. § 690.04. The Florida court construed the trust instrument in this case as giving the trustee discretion to allocate between corpus and income. *Martin Andersen, as Trustee*, No. 67–1052 (Aug. 8, 1967) at 5. All the interested parties, including Jeanette Andersen, the contingent income beneficiary (her daughter), and the contingent remaindermen (her daughter's children) were represented in the proceeding.

3. In the estate tax case before the Tax Court, the estate contended that Martin Andersen had continued to be the real owner of the stock even after he had given it to Jeanette in 1936, so that he, rather than Jeanette, was the settlor of the trust. The Tax Court, however, found that Martin had made an effective gift of the stock to Jeanette and that the corpus of the trust therefore was a part of her estate because of the life interest she retained in the trust.

4. I.R.C. § 691(a) provides in pertinent part:

"(1) General rule.—The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period (including the amount of all items of gross income in respect of a prior decedent, if the right to receive such amount was acquired by reason of the death of the prior decedent or by bequest, devise, or inheritance from the prior decedent) shall be included in the gross income, for the taxable year when received, of:

"(A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent;

"(B) the person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; or

"(C) the person who acquires from the decedent the right to receive the amount by bequest, devise, or inheritance, if the amount

tion reflecting estate taxes paid by the decedent's estate on any items constituting such income.[5]

In most cases that have arisen under these provisions the government has contended that particular items were income in respect of a decedent and therefore taxable to their recipients, and the recipients have denied that the items were in that category. The present case is the converse situation. Here the recipient (the trust) of the income (the gain on the notes) contends that the gain is income in respect of a decedent so that it may obtain a deduction for the estate taxes paid on the notes, and the government denies that the gain on the notes was income in respect of the decedent.

The purpose of these statutory provisions is explained in part in our summary of their legislative history in *Estate of Davison v. United States*, 292 F.2d 937, 155 Ct.Cl. 290, *cert. denied*, 368 U.S. 939, 82 S.Ct. 380, 7 L.Ed.2d 337 (1961). The income-in-respect-of-a-decedent provision first appeared in the 1939 Code. Prior to 1934, neither a cash basis taxpayer nor his estate was subject to federal income taxes on income he had earned and accrued but not received prior to his death. Congressional dissatisfaction with the discrimination between accrual and cash basis taxpayers and the concomitant loss of revenue from cash basis taxpayers resulted in section 42 of the Revenue Act of 1934.[6] This provision required the decedent to include in his final return income that otherwise would have been reported over several years, and thus subjected such income to higher marginal rates of taxation than if the decedent had lived to receive the income.[7]

Section 126 of the Internal Revenue Code of 1939, added in 1942,[8] eliminated the inequitable pyramiding effect of the accrual-at-death income concept of the prior law by incorporating in the Code the concept of "income in respect of a decedent." Congress understood that term to include items of income that, at the time of death, the decedent had earned or accrued but not yet received. *Grill v. United States*, 303 F.2d 922, 927, 157 Ct.Cl. 804, 813 (1962); *Keck v.*

---

is received after a distribution by the decedent's estate of such right.

\* \* \* \* \* \*

"(4) Installment obligations acquired from decedent.—In the case of an installment obligation received by a decedent on the sale or other disposition of property, the income from which was properly reportable by the decedent on the installment basis under section 453, if such obligation is acquired by the decedent's estate from the decedent or by any person by reason of the death of the decedent or by bequest, devise, or inheritance from the decedent—

"(A) an amount equal to the excess of the face amount of such obligation over the basis of the obligation in the hands of the decedent (determined under section 453(d)) shall, for the purpose of paragraph (1), be considered as an item of gross income in respect of the decedent; and

"(B) such obligation shall, for purposes of paragraphs (2) and (3), be considered a right to receive an item of gross income in respect of the decedent, but the amount includible in gross income under paragraph (2) shall be reduced by an amount equal to the basis of the obligation in the hands of the decedent (determined under section 453(d))."

5. I.R.C. § 691(c) provides in pertinent part:
"(1) Allowance of deduction.—

"(A) General rule.—A person who includes an amount in gross income under subsection (a) shall be allowed, for the same taxable year, as a deduction an amount which bears the same ratio to the estate tax attributable to the net value for estate tax purposes of all the items described in subsection (a)(1) as the value for estate tax purposes of the items of gross income or portions thereof in respect of which such person included the amount in gross income (or the amount included in gross income, whichever is lower) bears to the value for estate tax purposes of all the items described in subsection (a)(1).

"(B) Estates and trusts.—In the case of an estate or trust, the amount allowed as a deduction under subparagraph (A) shall be computed by excluding from the gross income of the estate or trust the portion (if any) of the items described in subsection (a)(1) which is properly paid, credited, or to be distributed to the beneficiaries during the taxable year."

6. Ch. 277, 48 Stat. 680, 694.

7. H.R.Rep.No.2333, 77th Cong., 2d Sess. 48, 83–84, *reprinted in* 1942–2 Cum.Bull. 372, 411, 435–36; S.Rep.No.1631, 77th Cong., 2d Sess. 100, *reprinted in* 1942–2 Cum.Bull. 504, 579–80.

8. Revenue Act of 1942, ch. 619, 56 Stat. 798, 831.

*Commissioner*, 415 F.2d 531, 534–35 (6th Cir. 1969); *Trust Co. of Georgia v. Ross*, 392 F.2d 694, 696 (5th Cir. 1967), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968); *Estate of Sidles v. Commissioner*, 65 T.C. 873, 880 (1976), *aff'd mem.*, 553 F.2d 102 (8th Cir. 1977), *acq.* 1976–2 Cum.Bull. 2. The purpose of section 126 was to shift the income tax liability for income that the decedent had earned or accrued but not received before death from the decedent to the person who received payment after death.

The shifting of income tax liability to the income recipient would have resulted in a significant difference between the tax treatment of income (1) received after the decedent's death and (2) received by the decedent prior to death and passed through the estate. In the latter situation, the income subject to tax under section 2036 of the Code would be the net amount after income taxes. By shifting income tax liability to the income recipient, section 126 created the likelihood of double taxation. This would result because the gross income the decedent had accrued but not yet received would be included in the estate, and an estate tax would be levied on that amount. The recipient of that income then would pay a tax on the entire income. Thus, the gross amount of income would be subjected to both an estate tax and an income tax. In effect, an income tax would be imposed without any adjustment to reflect the estate taxes already paid upon the income.

Section 691(c) of the Code provides some relief from this double taxation and reduces the disparity in treatment between income received by the decedent and income received directly by his successor. It does this by allowing the income recipient a deduction for estate taxes paid by the estate that are attributable to income received "by reason of the death of decedent." Ferguson, *Income and Deductions in Respect of Decedents and Related Problems*, 25 Tax L.Rev. 5, 146–48 (1969).

B. This case also involves the grantor trust provisions of subpart E of subchapter J of the Code, I.R.C. §§ 671–78. Those provisions enumerate several circumstances in which the general rule that a trust is to be taxed as a separate entity is "departed from on the theory that to apply [the rule] would improperly permit the grantor or other person who has substantial ownership of the trust property or income to escape tax on income which should rightfully be taxed to him." 6 Mertens § 37.01; Treas. Reg. §§ 1.671–2(a) and (d), 1.671–3. In effect, the grantor is treated for federal income tax purposes as the owner of the trust property because he has retained a substantial beneficial interest in, or substantial control over, the property.

A grantor is treated under subpart E as the owner of the trust corpus to the extent of his retained interest in the trust. I.R.C. § 671.[9] Section 677 of the Code provides that a trust shall be treated under section 671 to the extent that the grantor has retained a right to income.[10] The regulations

---

**9.** I.R.C. § 671 provides:

"Where it is specified in this subpart that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. Any remaining portion of the trust shall be subject to subparts A through D. No items of a trust shall be included in computing the taxable income and credits of the grantor or of any other person solely on the grounds of his dominion and control over the trust under section

61 (relating to definition of gross income) or any other provision of this title, except as specified in this subpart."

**10.** I.R.C. § 677 provides in pertinent part:

"(a) General rule.—The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or in the discretion of the grantor or a nonadverse party, or both, may be—

"(1) distributed to the grantor or the grantor's spouse;

"(2) held or accumulated for future distribution to the grantor or the grantor's spouse; or

"(3) applied to the payment of premiums on policies of insurance on the life of the

further provide that in computing taxable income the grantor, not the trust, should include the portion of the trust income to which the grantor retains the right. Treas. Reg. § 1.671–3(a).

The parties agree that, since Jeanette Andersen was entitled to the entire income from the trust (*see infra* pp. 1353–1355), the trust was a grantor trust governed by subpart E. The trust therefore should not have reported the gain reflected in the installment payments as income to the trust; it should simply have attached to the trust's income tax return an informational statement to show receipt of the income and disbursements to the grantor. Treas.Reg. § 1.671–4. Similarly, in her federal income tax return Jeanette Andersen should have reported that income as received not from the trust but directly from the maker of the notes.

C. Finally, this case involves the question whether the election of the trust to report the gain on the sale of the stock in 1965 on the installment basis, as section 453 authorized, resulted in an immediate realization of that gain and a deferral only of its receipt and taxation until each of the notes was paid, or a deferral of both realization and receipt until payment.

If the section 453 election deferred realization of the income until actual receipt of payment, then the installment payments in question were amounts realized after termination of the grantor's interest in the trust. To the extent those payments were allocable to income, they would be directly payable to the grantor's daughter as income beneficiary at the time of realization. Thus, despite the grantor's retained interest and constructive ownership under subpart E, she would have no right to the payments in question and would not be treated as owner of the corpus which produced those payments. If, however, the section 453 election deferred only the taxation of gain, then gain on the stock sale was fully realized in 1965, when Jeanette Andersen had a right to trust income and was constructive owner of the income-producing corpus.

### III.

The result in this case turns upon the answers to the following questions: (1) was the entire gain on the sale of the stock in 1965 realized at that time rather than realized *pro tanto* as each installment note was paid; (2) did the trust properly treat the entire gain on sale of the stock as allocable to income rather than to corpus, so that under the grantor trust provisions Mrs. Andersen, the income beneficiary, was viewed as the owner of that portion of the trust, the "income" of which was distributed to her; and (3) was the gain income in respect of a decedent for which the trust was taxable and entitled to a deduction for corresponding estate taxes, because the decedent was constructive owner of the corpus under subpart E? We discuss each of these questions in turn.

A. Section 453 of the Code "was enacted . . . to relieve taxpayers who adopted [the installment basis of reporting] from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had received in cash only a small portion of the sales price." *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 503, 68 S.Ct. 695, 700, 92 L.Ed. 831 (1948). The provision permits a taxpayer under specified circumstances to "return as income" the amount actually received in the taxable year of receipt. The section enables a taxpayer to defer paying the tax on gain from a sale made on the installment basis until the year in which he receives payment of each installment. The section appears in subpart E, a part of the Code generally concerned with the timing and method of accounting for income.

Generally, gain realized on a sale of assets is gross income under section 61(a) of the Code. The amount of that gain realized for federal income tax purposes includes any money "received" plus the fair market value of other property "received." I.R.C. § 1001(b). Section 1001(c) of the Code states that, unless otherwise provided in the Code, the amount realized is also the

grantor or the grantor's spouse (except policies of insurance irrevocably payable for a

purpose specified in section 170(c) (relating to definition of charitable contributions))."

amount recognized. I.R.C. § 451(a) provides that a taxpayer must account for any amount "received" in the year of receipt unless the taxpayer adopts an alternative method of accounting. The installment obligations in question were received, and their value was fully ascertainable, at the time of sale. The question therefore arises whether section 453 provides an alternative accounting method, an exception to the realization rule, or an exception to the rule for recognition of gain.

The government makes what it concedes to be the novel argument that section 453 of the Code creates an exception to the general rule that income is realized when it is received, so that the gain reflected in each note was neither realized nor recognized until the particular note was paid. The plaintiffs answer that section 453 defers only the recognition of income, not its realization, until the installment obligation is paid; and that the entire gain on the sale of the stock was fully realized in the year of the sale.

 We agree with the plaintiffs that section 453 defers the taxation of gain but does not defer the realization of that gain. The language of the section, its place in subpart E, which is the part of the Code that generally governs the timing and method of accounting, and the elective and remedial nature of the provision all indicate that section 453 was not intended to alter so basic a tax concept as the date of realization of income. 2 Mertens § 15.01. The Commissioner has concurred in this view; he has stated that section 453 "provides an elective method for reporting the income from installment sales of property. That section does not postpone the date of realization of the income but serves merely to postpone the taxation thereof." Rev.Rul. 60–68, 1960–1 Cum.Bull. 152.

Section 453 may be held to "postpone the taxation" of income either by deferring the recognition of gain or by providing an alternative method of accounting. We need not decide this question since, under either theory, all the gain on sale of the stock was fully realized in 1965, when Jeanette Andersen was the income beneficiary of the trust governed by section 677 of the Code.

B. The income-in-respect-of-a-decedent provision applies to installment obligations "received by a *decedent* on the sale or other disposition of property." I.R.C. § 691(a)(4) (emphasis added). The next question, therefore, is whether the gain realized in 1965 was received by the trust or by Mrs. Andersen at that time. Application of the grantor trust provisions to the facts of this case leads us to conclude that the settlor, rather than the trust, received the gain at the time of sale, and that within the meaning of section 691, the trust "acquired" the remaining installment obligations from the grantor at the time of her death.

The grantor trust provisions were designed to implement and codify the decision of the Supreme Court in *Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940) and the regulations the Commissioner adopted after that decision. In the *Clifford* case, the Court held that where a husband had created a trust to pay the income to his wife for 5 years and had retained broad powers of control and management of the corpus and over distribution of the income to the wife, the income from the trust was taxable to the husband. The Court stated the issue as "whether the grantor after the trust [had] been established may still be treated, under this statutory scheme, as the owner of the corpus." *Id.* at 334, 60 S.Ct. at 556. It indicated that, in the "absence of more precise standards or guides supplied by statute or appropriate regulations, the answer to that question must depend on an analysis of the terms of the trust and all the circumstances attendant on its creation and operation." *Id.* at 334–35, 60 S.Ct. at 556 (footnote omitted).

Subpart E, like the prior regulations, represents an attempt to implement the rationale of the *Clifford* decision in a manner which would provide greater certainty and predictability in administration of the Code. 6 Mertens § 37.01. Subpart E, like the regulations, defines specific circumstances in which state law and the trust form are

disregarded, and the grantor is taxed because he is the real owner of the corpus or some portion thereof. *See* Treas.Reg. §§ 1.671–1(a) and 1.671–3; Rev.Rul. 79–84, 1979–10 I.R.B. 18; Rev.Rul. 77–402, 1977–2 Cum.Bull. 222; Rev.Rul. 76–100, 1976–1 Cum.Bull. 123; Rev.Rul. 74–613, 1974–2 Cum.Bull. 153.

■ · One of the specific circumstances in which the grantor "shall be treated as the owner of any portion of a trust" is with respect to the portion of the trust corpus whose income "may be distributed" to him in the discretion of a nonadverse party. I.R.C. § 677(a). There is no claim that the trustees in this case were adverse parties. The gain on sale of the stock was income under section 61(a) of the Code. The question therefore arises whether the gain was income that the trust could properly distribute to Jeanette Andersen so that under the grantor trust provisions she would be the owner of the portion of the trust corpus which produced the gain represented by the notes.

The Florida circuit court determined that under the trust instrument Martin Andersen as trustee properly had treated the gain on the sale of the stock as income and distributed it to Jeanette. *See* p. 1349, *supra*, note 2. The government correctly tells us that under *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), the state court decision does not bind us. The government has not shown, however, that the Florida court erred. Moreover, *Estate of Bosch* indicates that, in the absence of a ruling of the highest state court, we should decide this question of Florida law as would a state court, giving proper regard to the decision of the lower Florida court. *Id.* at 465, 87 S.Ct. 1776. Our analysis of the Florida law and application of that law to the Jeanette Andersen trust causes us to reach the same conclusion as did the Florida court.

As previously noted (*supra* note 2), Florida law required that gain realized on the sale of corpus be allocated to corpus unless the trust instrument indicated a contrary intent by the settlor. The Jeanette Andersen trust stated that, "It is my intention that in the management of the Trust Estate the Trustees shall have as full and complete power, authority and discretion as they would have if they were the actual owners thereof." Paragraph 8 of the trust instrument provided that the proceeds the trust received upon certain specified dispositions of trust property (which did not include the 1965 sale of the Orlando Daily Newspapers stock) "be deemed to be principal and corpus of the Trust Estate, and not as income thereof."

A fair reading of these two provisions is that the settlor intended, as the Florida court held, that amounts the trust received under the dispositions that paragraph 8 covers were to be treated as corpus, and left it to the discretion of the trustee to decide how to treat the receipts on other dispositions of trust property. The trustee, Martin Andersen, treated the gain on sale of Orlando Daily Newspapers stock as income rather than corpus. The Florida court approved that treatment in a proceeding in which the settlor appeared and signed the consent decree approving the trustee's accounting. If this treatment of the gain on the sale of the stock was not in accord with Jeanette Andersen's intentions when she established the trust, presumably she would have made this known at the accounting proceeding. Instead, she acquiesced in and thereby approved the allocation of the gain as income rather than corpus.

This case is unlike the situation in *Estate of Bosch*, where the state court proceeding that resulted in a ruling favorable to the taxpayer's position was initiated only after the federal tax controversy had arisen. Here there is no indication or even suggestion that the 1967 Florida court accounting proceeding, which was brought to discharge Martin Andersen as trustee, was in any way motivated by the possibility that treatment of the gain as income rather than corpus might have favorable tax consequences.

■ C. Our rulings on the two prior issues lead us to conclude that the gain represented by the installment notes was income in respect of a decedent, on which the trust

was required to pay the income tax, and that under section 691(c) of the Code the trust was entitled to deduct the portion of the estate tax that was attributable to the gain.

1. Section 691(a)(1)(B) of the Code provides that "the amount of all items of gross income in respect of a decedent" shall be included in the gross income, for the taxable year when received, of "the person who, by reason of the death of the decedent, acquires the right to receive the amount . . . ." Section 691(a)(4) provides that the gain on "an installment obligation received by a decedent on the sale or other disposition of property, the income from which was properly reportable by the decedent on the installment basis under section 453" is, "if such obligation is acquired . . by any person by reason of the death of the decedent," income in respect of the decedent for purposes of I.R.C. § 691(a)(1).

As explained in point III. B, *supra*, under the grantor trust provisions Jeanette Andersen was treated as the owner of the corpus of the trust. Under I.R.C. § 691(a)(4), therefore, she "received" the installment obligations when the stock was sold. The gain on that sale "was properly reportable by the decedent on the installment basis under section 453." Since under the grantor trust provisions Jeanette Andersen was viewed during her life as the owner of the installment obligations for

federal tax purposes, those notes were "acquired by" the trust (which was within the statutory category of "any person") "by reason of the death of the decedent."

In other words, even though state law treated the trust as the owner of the notes, under federal tax law Jeanette Andersen was viewed as the owner during her life.[11] The trust therefore acquired the notes from her at the time of, and because of her death. Thus, under section 691(a)(4) of the Code the gain upon the installment obligations as they matured was, for purposes of I.R.C. § 691(a)(1), "considered as an item of gross income in respect of the decedent."

Under I.R.C. § 691(a)(1)(B), the gain reflected in the unpaid installment notes was gross income not properly includible in the decedent's final return because of the section 453 election. The trust "acquired" the right to receive those amounts by reason of the death of the decedent. Had Jeanette Andersen lived, the trust would have distributed to her all the gain on the installment sale as the notes were paid, in accordance with the decree of the Florida court. As long as the grantor lived, the trust was merely a conduit through which the gain on the sale was distributed to Jeanette Andersen, the person entitled to that gain.

Since the trust properly included those items in its gross income, I.R.C. § 691(c) entitled it to deduct the portion of the estate tax attributable to those gains.

11. The dissenting opinion argues that in *W & W Fertilizer Corporation v. United States*, 527 F.2d 621, 208 Ct.Cl. 443 (1975), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976), we held that in a similar situation, the trust and not the settlor was the owner of stock in the trust and therefore subject to income tax. In that case one of two stockholders in a subchapter S corporation had transferred his stock to a grantor trust. The Commissioner ruled that this action terminated the subchapter S status of the corporation because it resulted in a corporation having as a stockholder a person who was not an individual, *i. e.*, the trust. The corporation contended that because under the grantor trust provisions the stockholder was taxed on the trust income the stock produced, he also should be treated as the owner of the stock for subchapter S purposes.

The court rejected the argument. It pointed out that in subchapter S, Congress had imposed the "deliberately specific qualification"

that the benefits of that provision would be available only "to corporations whose stock is owned solely by individuals or estates" and it concluded that "[w]here such a deliberately specific qualification is imposed, we must strictly apply it lest the narrow benefit intended by Congress be unduly broadened." *Id.* 527 F.2d at 628, 208 Ct.Cl. at 455.

The present case, however, involves no comparable attempt by a taxpayer to use the grantor trust provisions to avoid a "deliberately specific qualification" such as that in subchapter S. To the contrary, as we discuss in the text below, it involves the type of situation that the income-in-respect-of-a-decedent and the grantor-trust provisions were designed to cover. The effect of those provisions is that even though under state law a trust owns property that the grantor has transferred to it, for federal tax purposes the grantor will be treated as the owner of the property.

2. The result we reach in this case furthers the basic policy of section 691(c) of the Code. That section is designed to provide relief from what many would view as the unfair situation of fully subjecting to income tax gain that is earned or accrued but not received by a decedent during his lifetime, where that gain has already been subjected fully to an estate tax. That is precisely the situation in this case. For under the decision of the Tax Court, the total value of the installment payments, most of which constituted gain, were included in Jeanette Andersen's taxable estate.

The effect of our decision here is to avoid the unfairness and harshness which would result if the entire gross amount of gain on the sale of Orlando Daily Newspapers stock was subjected first to the estate tax and then to the income tax without any deduction to reflect the prior estate tax levy on the same amount.[12]

The defendant's motion for summary judgment is denied, the plaintiffs' motion for summary judgment is granted, and the case is remanded to the Trial Division to determine the amount of recovery pursuant to Rule 131(c).

SKELTON, Senior Judge, dissenting:

I respectfully dissent because I cannot agree with the following express or implied findings and conclusions of the majority which, in my opinion, are unsupported by the facts or the law and are clearly erroneous:

(1) That the settlor, Mrs. Jeanette Andersen, retained an interest in the corpus of the stock when she created the trust in 1941.

(2) That Mrs. Andersen was the owner of, or had legal title to, the stock after the trust was created.

(3) That Mrs. Andersen had control over the stock after she conveyed it to the trust in 1941.

(4) That Mrs. Andersen, and not the trustees, sold the stock in 1965.

(5) That Mrs. Andersen, and not the trust, realized the capital gain from the sale of the stock in 1965 at the time of the sale.

(6) That Mrs. Andersen, and not the trust, was the owner of, and had legal title to, the installment notes received from the sale of the stock in 1965.

(7) That the capital gain from the sale of the stock was income and not corpus of the trust.

(8) That by paragraph 8 of the trust instrument and by the instrument as a whole, Mrs. Andersen vested the trustees with authority to determine in their discretion what was income and what was corpus of the trust.

(9) That the Government failed to show that the order of the Florida state court was wrong, and, therefore, it was correct.

(10) That Mrs. Andersen, by her appearance in the Florida court, authorized the court to rule that the capital gain was income and not corpus of the trust.

(11) That the unpaid installment notes were owned by Mrs. Andersen and were a part of her estate at the time of her death.

(12) That the trust acquired the notes from Mrs. Andersen at the time of her death even though there was no testamentary bequest to that effect in her will.

(13) That the purposes of the trust were complied with and carried out by treating the capital gain as income and not corpus of the trust.

(14) That after Mrs. Andersen's death, the capital gain income from the unpaid installment notes was income in respect of a decedent and by virtue thereof the trust was entitled to a deduction for the estate taxes under 26 U.S.C. § 691(c).

The facts show that Mrs. Andersen's husband, Martin, gave the shares of stock to her in 1941. Later, marital trouble developed between them and Martin became

12. In view of our decision on this issue there is no occasion to reach plaintiffs' alternative contention that, if the gain on the installment notes were not income in respect of a decedent, the trust was entitled to a stepped-up basis for the property under I.R.C. §§ 1014(a) and (b)(9).

fearful that a divorce might ensue and that his wife could remarry thus making it possible for her new husband to control the stock. Accordingly, he recommended to Mrs. Andersen on the advice of counsel that the stock be placed in an irrevocable trust with a reservation of the income to Mrs. Andersen for life and thereafter to Martin and, at his death, to their daughter. The trust was to terminate at the death of the daughter and the corpus was to be distributed to the daughter's children. If there were no children, the corpus was to be distributed to various other remaindermen. These were the purposes of the trust. An attorney drew up the trust instrument in accordance with the foregoing purposes and explained it fully to Mrs. Andersen, and "especially the fact that Jane [Mrs. Andersen] would have to part with all future control of the shares." Mrs. Andersen agreed and signed the trust instrument for the purposes stated above. Martin was named as trustee and Mrs. Andersen transferred the stock to him as the fiduciary of the Jeanette Andersen Trust in 1941.[1]

Under the well-established law of trusts, Jeanette Andersen divested herself of ownership of the stock when she transferred it to the trust.[2]

After the transfer of the stock to the trust, new shares of the stock were issued in the name of the trustee. It is a well-settled principle of trust law that when property is placed in trust, the legal title to the property is vested in the trustee as a fiduciary of the trust. *Neilson v. Lagow*, 12 Howard 98, 13 L.Ed. 909; *Adams v. Adams*, 21 Wall. 185, 22 L.Ed. 504; *Maguire v. Trefry*, 253 U.S. 12, 40 S.Ct. 417, 64 L.Ed. 739 (1920); *Chicago, M. & St.P.R. Co. v. Des Moines U.R. Co.*, 254 U.S. 196, 208, 41 S.Ct. 81, 65 L.Ed. 219 (1920); Bogart, Law of Trusts (4th Ed. 1963) § 10. The vesting of legal title in the trustee as a fiduciary has the effect of making the trust the owner of

the property. Therefore, after the transfer, the legal title and ownership of the shares of stock were held by the Jeanette Andersen Trust. Such a trust is recognized as a taxable entity separate and apart from the grantor. See *Helvering v. Bullard*, 303 U.S. 297, 58 S.Ct. 565, 82 L.Ed. 852 (1938); *United States v. O'Malley*, 383 U.S. 627, 86 S.Ct. 1123, 16 L.Ed.2d 145 (1966); *Manufacturers Hanover Trust Co. v. United States*, 312 F.2d 785, 792, 160 Ct.Cl. 582, 595, *cert. denied*, 375 U.S. 880, 84 S.Ct. 150, 11 L.Ed.2d 111 (1963); 26 U.S.C. § 641.

It is well established that when a trust is created the trustee has only the powers and authority given to him by the settlor in the trust instrument, together with implied powers which are necessary to carry out the purposes of the trust. *See* Bogart, Law of Trusts, § 88, 4th Ed. 1963; Restatement of Trusts, § 186, 2d Ed. 1959.

Obviously, the Jeanette Andersen trust was a "grantor trust" governed by Subpart E of the Code (i. e., §§ 671–678).[3] § 677(a)(1) of the Code provides that the grantor "shall be treated as the owner of any portion of a trust" whose income may be distributed to the grantor. Clearly, the fact that Mrs. Andersen was "treated" as the owner of the trust corpus for tax purposes did not make her the owner for the purposes of determining whether income received by the trust after her death was income in respect of a decedent.

In our prior opinion in this case, reported in 587 F.2d 1073, 218 Ct.Cl. —— (1978), we stated correctly:

"That section [§ 677(a)(1)], however, must be read in conjunction with section 671, which limits and qualifies it. Section 671 provides that when it is specified under subpart (E) (which includes section 677) of subchapter J of the Code (which deals with the taxation of trusts) that a grantor (or other person) should be treat-

---

**1.** These facts are shown in the opinion of the Tax Court in *Andersen v. Commissioner*, 32 T.C.M. (CCH) 1164 (1973).

**2.** In the creation of the trust, Mrs. Andersen used words of grant, i. e., "do, give, transfer, assign and deliver."

**3.** All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

ed as the owner of trust property, the items of income, deduction and credits against a tax of the trust shall be included in computing the taxable income of the grantor or other person.

"Section 671 is the operative provision of subpart (E); it specifies the result when a grantor is treated under subpart (E) as the owner of trust property. Section 677 is one of six subsections of subpart (E) that describe particular situations in which the grantor (or other person) is deemed to be the owner of trust property.

"Such attribution of ownership, however, is for the purpose of shifting the tax incidence of the trust income from the trust to the grantor or other person. Under this provision Jeanette Andersen would have been liable during her life for the income the trust realized upon payment of the notes, because section 677 would have attributed the notes to her. But that section did not make her 'the owner of' the trust property for purposes of determining whether the income the trust received from such property after her death was income in respect of a decedent under section 691. Section 677 made her the owner of the property only for the purpose of shifting the trust income to her during her lifetime, as section 671 provides." *Id.* 587 F.2d at 1079–1080, 218 Ct.Cl. at ——.

Thus, § 677 of the Code has a very limited application. It is used to shift the trust income to the grantor for income tax purposes. It does *not transfer ownership.*

The tax law does not create legal and property interests; it merely taxes them. The Supreme Court analyzed the creation of property interests, the tax law, and state law in *Helvering v. Stuart,* 317 U.S. 154, 63 S.Ct. 140, 87 L.Ed. 154 (1942). In that case, two taxpayers created trusts for the benefit of each of their children and each taxpayer named himself, his brother and sister-in-law as trustees. The court had to decide if §§ 166 and 167 (the predecessor of § 677 of the Code) of the Revenue Act of 1934 made the trust income taxable to the respective grantors. In order to reach a decision the court stated that:

". . . the instruments must be construed to determine whether the power to revest title to any part of the corpora in the grantors, or to distribute to them any of the income, lies with any persons not having a substantial adverse interest to the grantors. That construction must be made in the light of rules of law for the interpretation of such documents." 317 U.S. at 161, 63 S.Ct. at 144, 87 L.Ed. at 159.

In concluding that the trust instruments and the interests created thereunder should be construed according to state law the court said:

"When Congress fixes a tax on the possibility of the revesting of property or the distribution of income, the 'necessary implication,' we think, is that the possibility is to be determined by the state law. Grantees under deeds, wills and trusts, alike, take according to the rule of the state law. *The power to transfer or distribute assets of a trust is essentially a matter of local law. Blair v. Commissioner of Internal Revenue,* 300 U.S. 5, 9, 57 S.Ct. 330, 81 L.Ed. 465, 469; *Freuler v. Helvering,* 291 U.S. 35, 43–45, 54 S.Ct. 308, 78 L.Ed. 634, 640–642. Congress has selected an event, that is the receipt or distributions of trust funds by or to a grantor, normally brought about by local law, and has directed a tax to be levied if that event may occur. Whether that event may or may not occur depends upon the interpretation placed upon the terms of the instrument by state law. *Once rights are obtained by local law,* whatever they may be called, *these rights are subject to the federal definition of taxability.* Recently in dealing with the estate tax levied upon the value of property passing under a general power, we said that '*state law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed.*' *Morgan v. Commissioner of Internal Revenue,* 309 U.S. 78, 80, 60 S.Ct. 424, 84 L.Ed. 585, 588." 317 U.S. at 161, 63 S.Ct. at 144, 87 L.Ed. at 159. (Emphasis supplied.)

The general principle discussed in *Stuart* and in other federal tax cases that the state law controls the creation and existence of legal interests in property was restated in the more recent Supreme Court case of *United States v. Mitchell*, 403 U.S. 190, 91 S.Ct. 1763, 29 L.Ed.2d 406 (1971). The Court stated the principle as follows:

"In the determination of ownership, state law controls. *'The state law creates legal interests but the federal statute determines when and how they shall be taxed.'* *Burnet v. Harmel*, 287 U.S. 103, 110, 53 S.Ct. 74, 77 L.Ed. 199, 205 (1932); *Morgan v. Commissioner*, 309 U.S. 78, 80–81, 60 S.Ct. 424, 84 L.Ed. 585, 588 (1940); *Helvering v. Stuart*, 317 U.S. 154, 162, 63 S.Ct. 140, 87 L.Ed. 154, 159 (1942)." 403 U.S. at 197, 91 S.Ct. at 1768, 29 L.Ed.2d at 412. (Emphasis supplied).

Applying this principle to the case before us, it appears that Mrs. Andersen was taxable during her lifetime on the trust's income under §§ 671 and 677 of the Code because of her retained life estate. The Code was applied to the statecreated property interest and it was taxed accordingly. Even though § 677 states that she was "treated as the owner" of the trust corpus, that section does *not* make her the legal owner for all purposes because federal tax law does *not* create legal interests—it merely taxes them. The trust instrument stated that it was to be construed according to Florida law, and therefore, the ownership of the trust corpus, as will be explained in more detail later, was vested in the trust under Florida law. As a result, Mrs. Andersen did *not* own any of the installment notes which made up the trust corpus and, consequently, the income from such notes that was unpaid and not due at the time of her death could not have been income in respect of a decedent.

This is not the first time this court has been confronted with the problem of deciding whether the settlor or the trust was the owner of shares of stock. That exact question was considered and decided by our court in the case of *W & W Fertilizer Corporation v. United States*, 527 F.2d 621, 208 Ct.Cl. 443 (1975), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976),

which was also a Florida case. In that case, the grantor created a revocable inter vivos trust and transferred shares of stock to it. He retained the right to the income of the trust for life and also the right to revoke the trust and to revest the title to its assets in himself at any time. Corporate income taxes were assessed against the corporation, which sued for a refund, claiming that the grantor of the trust was the owner of the stock because of the interests he had retained. We held that the trust was the owner and that it was properly taxed as such. We held:

"Taxpayer's third contention is that because Lemuel, as grantor of the Woods Trust, is taxed on the trust income under the 'grantor trust rules' of section 671, *et seq.*, the trust should be ignored. The argument is that it would be inconsistent not to consider him the owner of the shares for Subchapter S eligibility purposes and yet tax him as their 'owner' on the income they produce. Taxpayer, however, misconceives the manner in which the 'grantor trust rules' operate. *They do not, as taxpayer urges, recognize the grantor as the legal 'owner' of the property placed in trust.* On the contrary, the rules arose under the Code because it was recognized by Congress that taxation of income is not concerned so much with refinements of title as it is with actual command over the property taxed. *Corliss v. Bowers*, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916 (1930). The 'grantor trust rules' treat the grantor as if he were the owner in cases where he has reserved to himself some of the powers normally attendant to outright ownership. Thus, their design is to expand the coverage of the taxing statute."

. . . . .

"The applicability herein of the 'grantor trust rules' embodied in section 671 *et seq.*, therefore, reinforces, rather than refutes, the argument that *the Woods Trust must be recognized as the owner of taxpayer's stock*." 527 F.2d at 627–28, 208 Ct.Cl. at 455–456. (Emphasis supplied).

It is clear from our decision in that case that the grantor trust rules are purely for

taxation purposes and have nothing to do with ownership or legal title to the property. It should be noted, also, that the position of the grantor in that case with respect to ownership was much stronger than that of the grantor in the instant case, because of the extensive reservation of rights and almost complete control over the trust property that was reserved by the grantor of the trust. Yet we held that the trust was the owner of the stock. Our reasoning and decision in that case are especially applicable to the instant case.

Therefore, although the grantor is "treated" as the owner of the trust corpus for the taxation purposes of §§ 671–678 of the Code, the grantor is *not* made the legal owner of the trust corpus for other purposes by these sections of the Code.

In the instant case, the trust owned and controlled the stock from the time the trust was created in 1941 until the stock was sold in 1965, a period of 24 years, without any control or attempted control by Mrs. Andersen. The trust, and not Mrs. Andersen, sold the stock in 1965. The notes were payable to the trust and not to Mrs. Andersen. As the notes were paid, the payments were made to the trust, not to Mrs. Andersen. The trust, and not Mrs. Andersen, made the election to have the notes paid on the installment plan. The notes were always in the possession of the trust. As a matter of fact, there is no evidence that Mrs. Andersen ever claimed to be the owner of the notes. She did not dispose of them in her will. Neither did her daughter-executrix claim that the notes belonged to Mrs. Andersen's estate, as they were not listed in

the estate tax returns that she filed. In her suit in the Tax Court the executrix did not claim that the notes belonged to Mrs. Andersen's estate. In fact, she stipulated in that court that they belonged to the trust. Had the notes belonged to Mrs. Andersen's estate, there would not have been any need to file the Tax Court suit.

When the trust sold the shares of stock, the Trustee treated the gain received as income instead of corpus. The majority has concluded that since the gain was "income" and since Jeanette Andersen had the right to such income, the gain, as evidenced by the installment notes, belonged to her and not the trust. They base their conclusion on their interpretation of the trust instrument and on a Florida court decision, which approved the trust accounts and released Martin Andersen from the office of trustee and appointed Marcia Andersen Murphy and the First National Bank at Orlando as successor co-trustees.[4]

The majority misinterpreted the trust instrument. Furthermore, they have not construed it according to Florida law which the trust instrument required. These points are discussed below.

As a general rule, profit derived from the sale of stock which is a part of trust corpus is itself corpus. Scott, The Law of Trusts (1939), § 233.1; Bogart, The Law of Trusts and Trustees (2nd Ed. 1962), § 823;[5] Restatement of Trusts (2nd Ed. 1959), § 233.

The state of Florida follows this general rule by recognizing that any profits received from the sale of trust corpus is also corpus. Fla.Stat.Ann., § 690.04[6] Florida recognizes an exception to this general rule

---

**4.** *Martin Andersen, as Trustee*, No. 67–1052 (Aug. 8, 1967), Circuit Court, Orange County, Florida.

**5.** Bogart also recognizes that if there is evidence that the gain from the sale of stock which is a part of trust corpus was due to accumulated undistributed corporate earnings, the gain is income or at least a portion of it is attributable to income. There is no such evidence before us in this case which would require the application of this theory.

**6.** "690.04 Income and principal; disposition
(1) All receipts of money or other property paid or delivered as rent of realty or hire of

personalty or dividends on corporate shares payable other than in shares of the corporation itself, or interest on money loaned, or interest on or the rental or use value of property wrongfully withheld or tortiously damaged, or otherwise in return for the use of principal, shall be deemed income unless otherwise *expressly provided in this chapter.*
(2) All receipts of money or other property paid or delivered as the consideration for the sale or other transfer, not a leasing or letting, of property forming a part of the principal, or as a repayment of loans, or in liquidation of the assets of a corporation, or as the proceeds of property taken on eminent domain proceedings where separate awards to tenant

which allows the grantor to direct how income and corpus are determined. Fla.Stat. Ann., § 690.03.[7]

The majority says that this exception to the general rule is applicable to the instant case. The majority relied on two provisions of the trust instrument in concluding that the grantor had given the trustee discretion to determine what is income and what is corpus. The first provision on which they rely is contained in Paragraph 1 dealing with the trustee's power to invest, sell and otherwise handle the trust property.

Although the majority states that this provision gives the trustee discretion to determine income and corpus, such is clearly not the case. Paragraph 1 discusses the trustee's powers *as a fiduciary* in investing and disposing of the trust property. The Tax Court properly construed Paragraph 1 by saying:

> "Martin received broad powers as a fiduciary to deal with the trust corpus:
>> 'It is my intention that in the management of the Trust Estate the Trustees shall have as full and complete power, authority and discretion as they would have if they were the actual owners thereof.' "

The plain meaning of this provision is that the trustee was to have as full and complete power and discretion as a fiduciary in managing the trust corpus as he would have if he as an individual were the actual owner of the stock instead of the trust. The provision was not a limitation on the title or ownership of the stock by the trust. Neither was it a reservation of title or ownership in Mrs. Andersen. It does not involve in any way the treatment of the proceeds received from any sale or other disposition of the property belonging to the trust. The provision is merely a "general power", as the trust instrument so states, to enable the trustee to have a free hand in managing the trust estate.[8]

The other provision in the trust instrument which the majority says gives the trustee the powers and discretion to decide how to treat the receipts from the "disposition" of trust property is Paragraph 8. That paragraph provides as follows:

> "8. I direct that any shares of stock, securities or other property of whatsoever character, except only cash, which shall be issued, assigned, transferred, conveyed or delivered to the Trustees by reason or on account of any shares of stock or securities of any corporation then owned by and constituting a part of the Trust Estate, whether the issuance, assignment,

and remainderman are not made, or as proceeds of insurance upon property forming a part of the principal except where such insurance has been issued for the benefit of either tenant or remainderman alone, or otherwise as a refund or replacement or change in form of principal, shall be deemed principal unless otherwise expressly provided in this chapter. Any profit or loss resulting upon any change in form of principal shall enure to or fall upon principal.

(3) All income after payment of expenses properly chargeable to it shall be paid and delivered to the tenant or retained by him if already in his possession; or held for accumulation where legally so directed by the terms of the transaction by which the principal was established; while the principal shall be held for ultimate distribution as determined by the terms of the transaction by which it was established or by law." [§ 690.-04 was repealed in 1974. Its provisions are now contained in § 738.03.]

**7.** "690.03 Application of chapter; powers of settlor

This chapter shall govern the ascertainment of income and principal, and the apportionment of receipts and expenses between tenants and remaindermen, in all cases where a principal has been established with or, unless otherwise stated hereinafter, without the interposition of a trust; except that in the establishment of the principal provision may be made touching all matters covered by this chapter, and the person establishing the principal may himself direct the manner of ascertainment of income and principal and the apportionment of receipts and expenses or grant discretion to the trustee or other person to do so, and such provision and direction, where not otherwise contrary to law, shall control notwithstanding this chapter." [§ 690.03 was repealed in 1974. Its provisions are now contained in §§ 738.04 and 738.15.]

**8.** The terms "trustee" and "trustees" are used interchangeably herein. The singular includes the plural.

transfer, conveyance or delivery of any such shares of stock, securities or other property by such corporation be by way of a dividend by such corporation or upon its dissolution, or in any liquidation of its capital, or as a part of, in connection with or by reason of any reorganization, consolidation or merger of any such corporation or sale of its assets or adjustment of its affairs, or otherwise howsoever, shall, for all purposes of the Trust Estate and of the provisions of this instrument, be deemed to be principal and corpus of the Trust Estate, and not as income thereof."

Even a casual reading of Paragraph 8 shows that there is no mention whatever of a sale or "disposition" of the trust corpus or any part thereof. The paragraph simply provides that the *receipt* by the trustees of stock, securities or other property by way of a dividend, liquidation, reorganization, consolidation or merger, sale of assets, adjustment of affairs or otherwise, except cash, from any corporation in which the trust owned stock would be principal and corpus of the trust estate and not income thereof. The paragraph is limited in two respects, namely, (1) to property *received by the trust* where no sale of trust property is involved, and (2) the property must be received by the trust from a corporation in which the trust owns stock. Neither situation is involved in this case. To hold, as the majority does, that this paragraph gave the trustees the discretion to determine whether the proceeds from the *sale* of trust property is income or corpus bridges too wide a gap for me to cross over. In my opinion, it is both illogical and contrary to the plain provisions of the trust instrument. Also, the holding of the majority is contrary to accepted principles of trust law.

An analysis of the trust instrument does not reveal any intent on the part of the grantor to give the trustee the authority or discretion to determine what is income and what is corpus. Certainly, no such intent or authorization is expressly stated anywhere in the trust instrument. The majority attempts to impute such intent to the grantor by implication. Such a holding will not withstand close scrutiny on the facts or under the law.

As stated above a trustee only has such powers as are stated in the trust instrument or which may be implied therefrom in order to carry out the purposes of the trust. The converse is also true, i. e., powers of a trustee that frustrate or destroy the purposes of a trust cannot be implied from a trust instrument. That is exactly what the majority opinion does in the instant case. We only need to look at the purposes of Mrs. Andersen's trust and consider the effect the majority opinion has on such purposes to determine, that this is so. The purposes of Jeanette Andersen in creating the trust were to create a fund to provide for the support and maintenance of the beneficiaries during their lives, and to provide a fund to be distributed to the remaindermen on the death of her daughter. Paragraph 9 of the trust instrument stated in pertinent part as follows:

". . . the intent and purpose of this Indenture being to provide a fund which shall under all circumstances during the life of the trusts by this Indenture created be available for the support and maintenance of the beneficiaries."

Paragraphs 2, 3 and 4 provided that the net income would be paid to Mrs. Andersen during her life, then to her husband, Martin, during his life (he later renounced his interest in the trust), and then to her daughter, Marcia, during her life, and at her death the corpus was to be distributed to named remaindermen. Elaborate provisions were made for the support, maintenance and education of any remainderman who was a minor at the time of the distribution of the corpus.[9]

---

9. The provisions were as follows:

"2. The net income from said trust estate shall be paid to me at convenient installments for and during the rest of my life.

"3. From and after my death, the net income from the Trust Estate shall be paid to my husband, Martin Andersen, during his life.

"4. From and after my death, or the death of my husband, whichever event shall occur later, the net income from the Trust Estate shall be paid to my daughter, Marcia Andersen, for and during the rest of her natural life.

"5. Upon the death of my daughter, the principal of said Trust Fund shall be divided

The decision of the majority that the Trustee had the implied power to determine that the gain on the notes was income and not corpus has the effect of destroying the corpus and the net income therefrom and requiring it to pass through the estate of Mrs. Andersen as her property. No longer would there be any corpus from which income could be paid to the daughter during her lifetime, nor any corpus after her daughter's death to be distributed to the remaindermen, including the support, maintenance and education of minor remaindermen. Thus, the opinion of the majority effectively defeats and destroys the purposes of the trust by attributing implied powers to the Trustee that were never intended by the grantor of the trust, and which are contrary to the plain provision of the trust instrument. This is contrary to the well-established principles of trust law.

The majority's reliance on the Florida Circuit Court decision in *Martin Andersen, as Trustee, supra,* for their conclusion that the Trustee properly treated the gain on the sale of the stock as income is misplaced. The majority holds that the Florida court "determined that under the trust instrument Martin Andersen as trustee properly had treated the gain on the sale of the stock as income and distributed it to Jeanette." I do not agree. The order of the Florida court nowhere mentions the "gain on the sale of the stock" as either income or corpus. The pertinent parts of the order of the Florida court were as follows:

". . . and that said Petitioner seeks a determination and construction

and paid over to the children of my daughter, the child or children or any deceased child taking by representation the share of said deceased child. Should there be no children or descendants of said children living at the time of the death of my daughter, the principal of said Trust Estate shall be equally divided between the children of my husband's sister, Julia Herr, and the children of my sister, Olene Mays. Should there be no children of my husband's sister, Julia Herr, and my sister, Olene Mays, living at the time of the death of my daughter, the principal of said Trust Estate shall then be distributed upon the death of my daughter to the parties and in the interests and proportions as if my daughter, at the time of her death had been, if in point of fact she should not be a citizen and resident of the State of Florida, and at the time of her death had actually owned in her own right, the properties and funds then constituting the Trust Estate.

"6. If it should happen that any part of the Trust Estate shall become distributable to a minor, I direct that the distribution of such part of the Trust Estate as shall be distributable to such minor shall be deferred until such minor shall have attained unto the age of twenty-one (21) years, and in the event of the death of such minor prior to his or her attaining unto the age of twenty-one (21) years, I direct that his or her share in the Trust Estate shall be distributed, upon the death of such minor, to the parties and in the interests and proportions as if such minor at the time of his or her death had been, if in point of fact he or she should not be, a citizen and resident of the State of Florida, and at the time of his or her death had actually owned in his or her own right the properties and

funds then constituting his or her share in the Trust Estate. I direct that the Trustees, during the minority of any such minor, instead of paying over to such minor the income realized from his or her share of the Trust Estate, shall apply to his or her support, maintenance and education so much of such income as the Trustees, in their absolute discretion, shall deem proper, accumulating for the benefit of such minor any surplus income not so applied and paying over to such minor, upon his or her attaining unto the age of twenty-one (21) years, all such surplus income, if any, with its accumulations. Any income thus directed to be applied to the support, maintenance and education of a minor, in the discretion of the Trustees, shall be applied either directly by the Trustees or shall be paid to the parent or guardian of such minor, and the receipts of such parent or guardian shall be a sufficient discharge to the Trustees for all payments so made. In the management of any such part of the Trust Estate, the distribution whereof may thus be deferred by reason of the minority of the distributee, the Trustees shall have like powers, authorities and discretions as are herein conferred upon them with respect to the entire Trust Estate, including the power and authority to distribute to or for the account of any such minor, prior to his or her attaining unto the age of twenty-one (21) years, the whole or such part of the corpus of such minor's share of the Trust Estate as the Trustees, in their absolute discretion, shall deem advisable or necessary for the support, maintenance or education of such minor."

**1364**

from this Court as to the manner of administration of the Trust provided for in Article 2 and Article 4 of the said Trust Declaration, as amended, and, in particular, that the said Petitioner seeks a construction and determination under said Articles whether any part or portion of the net income, when realized, may be retained, and if retained beyond the current year, may be considered as income for the purpose of eventual distribution to the current income beneficiary, Jeanette Andersen, and the contingent income beneficiary, Marcia Andersen Murphy, during their lives or upon their deaths must be considered as accumulated income to be added to the principal of said Trust Fund and held and reinvested for eventual distribution to the remaindermen of the said Trust; . . ."

. . . . .

"[It is] ORDERED, ADJUDGED AND DECREED that the directions under Article 2 and Article 4 of the Trust Declaration dated the 25th day of March, A.D. 1941, as amended, that the Trustee pay the net income from the Trust to the current income beneficiary at convenient installments for and during the rest of her life and to the contingent income beneficiary for and during the rest of her natural life, are held and construed to mean that the said income beneficiaries, while entitled to receive the net income therefrom, possess a present and immediate, vested, equitable interest in the entire net income arising from the administration of the said Trust, subject, however, to a discretion granted to the said Trustee authorizing the said Trustee to initially determine the composition of net income and subject to a further discretion in the said Trustee to further determine the time and manner of distribution of such net income to the income beneficiary, and such discretions to be exercised reasonably and prudently by said Trustee

during the life of the current income beneficiary, and that upon the death of such income beneficiary, any accrued, and as yet undistributed income, shall be paid to such beneficiary's personal representative or representatives and that under the terms of the said Article 2 and Article 4 of said Trust Declaration, as amended, the Trustee is granted no authority to accumulate any of such net income as additions to the principal of said Trust Fund for eventual distribution to the named remaindermen thereunder; . . ."

That court's interpretation of the trust instrument involved only two articles—Articles 2 and 4. Both of these articles related to the payment of the "net income" to the beneficiaries.[10] They did not deal with the Trustee's power to determine what is income and what is corpus.

The Florida court only considered the authority of the Trustee to decide what was "net income" of the trust. Such income would naturally include interest on the notes less the expenses of the trust. The court gave no consideration whatever to the status of the capital gain on the notes. No doubt, this was because under the laws of Florida, capital gain on the sale of trust corpus is itself a part of the corpus. Obviously, the Trustee's power to "determine the composition of net income" was nothing more than bookkeeping authority. This did *not* mean, however, that he could determine what was income and what was corpus. Instead, a fair reading of the order, the purpose of the interpretation, and the articles under which the interpretation was made, indicate that the Trustee necessarily had authority to determine the "net income" of the trust for the purposes of payment to the life beneficiaries. He would have that authority without the Florida court order. Otherwise, he could never pay the beneficiaries anything. Furthermore,

10. Articles 2 and 4 stated as follows:
 "2. The net income from said Trust Estate shall be paid to me at convenient installments for and during the rest of my life.
 4. From and after my death, or the death of my husband, whichever event shall occur later, the net income from the Trust Estate shall be paid to my daughter, Marcia Andersen, for and during the rest of her natural life."

the Florida court specifically stated that the Trustee could not accumulate net income as an addition to corpus. This clearly shows the Florida court's reluctance to imply a power, i. e., the power to add income to corpus. If the Trustee could not treat income as corpus and add it to corpus (as the Court stated) it follows that the Trustee could not treat corpus as income and add it to income. If he could not do the one, he should not be able to do the other.

In my opinion, the majority is reading findings, conclusions and holdings into the Florida court order that are not there. If that court's decision means what the majority says it does, the decision is clearly wrong, as it is contrary to the trust instrument, is contrary to Florida law, and it frustrates and defeats the purposes of the trust. I cannot believe the court had any such intention or purpose. That court, as shown by the order quoted above, clearly intended that the corpus was to be preserved and not destroyed by the Trustee's classifying it as income. This is shown by the provision in the order that the Trustees would hold the "principal of the trust fund for eventual distribution to the named remaindermen therein." It follows, on the other hand, that if all of the corpus could be converted into income by the Trustee, there would be no corpus to distribute.

The majority also states that Mrs. Andersen, as grantor, "acquiesced" and "thereby approved" the allocation of the gain as income because she did not object to it at the accounting proceeding. Regardless of Mrs. Andersen's actions and intent at that proceeding, her intent at the time of the execution of the trust instrument controls. *Jenkins v. Donahoo*, Fla., 231 So.2d 809 (1970); Restatement of Trusts, (2d Ed. 1959) § 164. She could not later alter or amend the terms of the trust instrument because she renounced that power in the trust instrument. Bogart, Law of Trusts, (4th Ed. 1963), § 145.

The Florida courts have strictly construed trust instruments and have been reluctant to imply powers to a trustee. In the case of *Jordan v. Landis*, 128 Fla. 604, 175 So. 241 (1937), the Florida Supreme Court had a trust before it the purpose of which was the creation of a public charitable school. The grantor conveyed a tract of land to eight individuals as trustees. The school was built and put into operation. Twenty-five years after the creation of the trust, the surviving trustees conveyed the tract of land to a nonprofit corporation which had been formed sometime earlier by some of the trustees. The trustees contended that the nonprofit corporation was formed to continue the purposes of the trust. The Florida Supreme Court held that the trustees did not have the power to convey the tract of land nor appoint successor trustees, because the trust instrument did not expressly provide for the same.

Section 690.03 of the Florida Annotated Statutes which allows the grantor to give the trustee power to decide what is income and what is corpus has not been specifically construed by a Florida court. However, the Pennsylvania Supreme Court, whose decisions have been recognized on occasion by the Florida Supreme Court (See *Jenkins v. Donahoo, supra*), has construed its statute, which is identical to Florida's. The Pennsylvania court has held that where a trustee is to be given discretionary power to determine what is income and what is corpus, the grantor must clearly express his intention to do so. *In re Estate of Weiss*, 454 Pa. 114, 309 A.2d 793 (1973).

In any event, as pointed out by the majority, we are not bound by the decision of the Florida trial court. The case was not appealed and we do not have a decision on the matter by the highest court in that state. The Supreme Court held in *Commissioner v. Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), that the decision of a lower state court is not controlling "where the highest court [in] the state has not spoken on the point." Also, see *King v. Order of Travelers*, 333 U.S. 153, 68 S.Ct. 488, 92 L.Ed. 608 (1948).

It is clear that the proceeding in the Florida court was nothing more than a routine hearing to examine the final account of trustee Martin Andersen for the purpose of discharging him from his trust. No one contested the account and it was approved

as a matter of course. The hearing was not an adversary proceeding in the true sense of the term. Any practicing attorney knows that where no contest is filed, final accounts of fiduciaries, such as guardians and trustees, are routinely approved by courts with scarcely any questions being asked. That was the situation here. One thing we can be sure of is the fact that the problems involved in the instant case as to the capital gain on the stock and the ownership of the notes was not considered nor passed on by the Florida court. Consequently, for all of the reasons stated above, I would not give any weight to the order of that court as being relevant to the disposition of any issues in the instant case.

It should be pointed out that the trust made the election under § 453 of the Code at the time of the sale of the stock to report the gain on the installment basis. This is proof that it owned the notes.[11] If Mrs. Andersen had been the owner of the notes, she should have made the § 453 election. If she had been the owner, her failure to make a timely election would have prevented her from reporting the gain on the installment basis. See *Marcello v. Commissioner*, 414 F.2d 268 (5 Cir. 1969); *Ackerman v. United States*, 318 F.2d 402 (10 Cir. 1963); 26 U.S. C.A. § 453; 26 C.F.R. 1.453–8(b). This is further proof that she did not own the notes.

It is obvious that the Trust would not have dared to contend that Mrs. Andersen was the owner of the notes at the time of the sale of the stock, because (1) in the absence of an election by Mrs. Andersen under § 453 to pay the taxes on the gain on an installment basis, the I.R.S. could have collected all of the taxes on the gain at one time; and (2) if Mrs. Andersen were the owner, the trust would not have had control of the notes as trust corpus. Thus, it appears that the contention of the Trustees in the instant suit that Mrs. Andersen owned the notes is nothing but a hindsight afterthought and maneuver to avoid the payment of the taxes. It appears further that the Trustees by their inconsistent positions

are playing games with the courts and the taxing authorities. This should not be permitted.

The Tax Court held that at the time of Jane's (Mrs. Andersen's) death, eleven of the notes, each in the sum of $242,179.50, and a larger note in the sum of $1,453,077, [all in the total sum of $4,117,051.50] were unpaid but not matured or due. The parties stipulated the value of the trust corpus in the Tax Court. In that connection, the Tax Court said:

> ". . . the parties have stipulated that the fair market value of the assets in the trust at the time of Jane's death was $4,853,196.46."

It is uncontroverted that the value of the unpaid notes was included in this stipulation. This is further proof that the trust and not Mrs. Andersen owned the notes.

Furthermore, the daughter, Marcia, signed the stipulation in her capacity as executrix of the estate of Jeanette Andersen. The estate and Marcia, a life beneficiary of the trust, should be bound by that stipulation, although Marcia appears in the present suit as a trustee. Nevertheless, she will be one of the ultimate beneficiaries should the trust prevail in the instant suit. It appears that she wears a coat of many colors, but we should consider substance rather than form.

As stated above, the installment notes were payable to the trust. Therefore, the taxpayer in this case (i. e., the trust), because of its past actions, would appear to be estopped from denying that it owned the installment notes. This "estoppel theory" has been recognized in other tax cases. See *Farha v. Commissioner*, 483 F.2d 18 (10 Cir. 1973). In that case, the taxpayer owned stock in a corporation and owned an interest in a partnership. The corporation's and partnership's business dealings were intertwined in a single business with the corporation being involved in the buying, selling and processing of meat and food and with the partnership owning the land, buildings, trademarks, and tradenames used in the

---

11. If the trust did not own the notes, it had no authority to make the § 453 election to report the gain on the installment basis.

business. The taxpayer sold his business. The partnership sale and the sale of the corporate stock were evidenced by separate agreements. In holding that the taxpayer could not treat the two sales as one transaction for the purposes of § 453, the court stated that the corporation and partnership were separate legal entities that had been treated as such by the taxpayer and, as a result of his past conduct of treating the corporation and partnership as separate legal entities, the taxpayer was estopped from denying their separate existence.

In the instant case, the notes were payable to the trust, which treated them as its property. When due, the notes were paid to the trust and it paid the taxes due thereon. It should now be estopped from taking a different position as to the ownership of the notes. If this case were tried, and perhaps it should be, I am confident that the evidence would show that the Trustees have continued to possess and manage the notes as a part of the trust corpus at all times since the trust was created in 1941 without any interruption or change by reason of the death of Mrs. Andersen, and that the trust has continued to receive the payments on the notes, and has continued to pay the income from the trust to Marcia and will do so in the future until the trust terminates and the corpus is distributed to the remaindermen according to the terms of the trust instrument. Such evidence would show overwhelmingly, in addition to the evidence now before us, that the trust is estopped from contending that it did not own the notes during Mrs. Andersen's lifetime. The very fact that the Trustees have filed the instant suit shows that the trust is still in existence and that it is trying to protect the corpus from the payment of the assessed taxes.

The majority opinion states that the trust "acquired" the notes from Mrs. Andersen at her death. However, the majority fails to state how this transfer was accomplished. If Mrs. Andersen were the owner of the notes, her estate would own them at her death unless she disposed of them otherwise in her will. The facts show she left a will which named her daughter as executrix because her daughter filed the tax court suit

in that capacity. The notes were not listed in the estate tax return as a part of Mrs. Andersen's property. If she owned the notes, in the absence of some testamentary transfer to the trust in accordance with Florida law, the trust could not have acquired the notes from her at her death. State law controls the transfer of property interests, *not* tax law.

The majority errs in adopting the argument of the Trustees that the notes were income and not corpus of the trust during the lifetime of Mrs. Andersen and that she owned them until her death, when somehow at the time of her death (as if by magic) the notes ceased to be income and became corpus of the trust, and by some unexplained method, which was not by a testamentary bequest or any other known or proven conveyance, the ownership of the notes was transferred from Mrs. Andersen's estate to the trust. Such an argument is pure fiction and cannot be supported by the facts or the law.

The majority is concerned about the harshness of the result if they decide the case for the Government. This is commendable, and I share that concern. However, tax laws are not intended to be just or benevolent—they are enacted by Congress to produce revenue regardless of the effect on the taxpayer. If a certain tax law or a statute of limitation, for instance, produces a harsh or unjust result in a given case, which often happens, that is no reason for a court to ignore the law. See 84 C.J.S. *Taxation* § 4, p. 45, where it is stated:

> ". . . the mere fact that taxation is unjust or oppressive is no ground for judicial interference, where no constitutional provision has been violated."

See also the concurring opinion in *Alexander Proudfoot Co. v. United States*, 454 F.2d 1379, 197 Ct.Cl. 219 (1972).

It may be that the majority became so engrossed and occupied in the herculean task of construing and interpreting the complicated tax laws involved here that they lost sight of the simple facts in the case that should control its disposition. At first, the case seemed to be very complex and difficult. Actually, it could and should

be decided by several simple sentences, such as:

"Mrs. Andersen did not own the notes at the time of her death, and, therefore, the payment of the notes after her death was not income in respect of a decedent. Consequently, the trust is not entitled to deduct the estate tax from its income taxes under § 691(c) of the Code. Accordingly, the Government's motion for summary judgment should be granted."

I would deny the petition for rehearing and approve our prior decision granting the Government's Motion for Summary Judgment.